Good morning, Your Honors. May it please the Court, my name is Christopher Winter and I represent the petitioner Alaska Eskimo Whaling Commission and I'd like to reserve five minutes for rebuttal this morning if I could. Your Honors, we're here today because the discharge of up to 1.6 billion gallons of industrial and human waste allowed under EPA's general permit could disrupt traditional subsistence uses in the Beaufort Sea that have been taking place for the last 2,000 years. AEWC's interest here is to find ways that oil and gas activities can move forward in the Beaufort Sea while ensuring protection for those subsistence activities. The most fundamental problem with EPA's decision here, Your Honors, is that its conclusion on unreasonable degradation is not based on the appropriate statutory criteria in Section 403 of the Clean Water Act and the permitting decision thus contains three central errors that I'd like to discuss this morning. The first error is that EPA provided no detailed findings on the impacts from these specific discharges on pre-existing subsistence uses of the Beaufort Sea. The second fundamental error is that EPA then failed to balance those impacts against the benefits of discharge as required by its regulation. And the third fundamental error is that EPA failed to conduct an analysis of the alternatives to discharge and instead relied on monitoring the collection of future information and the ability to reopen the permit. On the first point, Your Honors, the record here does not include any detailed findings on the potential impacts of subsistence uses of the Beaufort Sea. These impacts can result not only from concerns over food tainting but also from the deflection of bowhead whales from subsistence use areas which in turn could make the annual fall subsistence hunt much more dangerous for my clients who would then have to travel very far distances in the harsh conditions of the Arctic. I guess you say this could make this happen but it's up to the Commission, isn't it, to determine whether it will and to make their best estimate of it. Isn't that what they did? Your Honor, so I think here the record contains extensive input from the local communities based on their traditional knowledge and direct experience in the pristine Arctic that this level of discharge, in particular 84 million gallons of non-contact cooling water in the subsistence hunting areas, is likely to deflect bowhead whales. And that traditional knowledge is based on previous experiences with other drilling operations that occurred in these same areas in the 80s and 90s. There is no other available information that EPA could point to in the record in support of a conclusion that deflection will not occur. And I think this gets to the notice of error that the agency submitted with the court yesterday morning in which it admitted that the only modeling results it could point to at the time of this decision, in fact, don't address non-contact cooling water at all. Well, they included in, if I understood the letter, they include that in other liquids and that the modeling that was attached to their letter includes the non-contact cooling, as along with others in its analysis. It's just that it doesn't have a separate one for just that kind of water that they correct. That was what I thought they were correcting. I maybe have it wrong, but you can enlighten me. Yes, Judge Canby, thank you for that question. And I think EPA in its notice implied in that document that was filed yesterday, that Table 6 that was attached, provides a different basis for EPA's decision and conclusion on the impacts of non-contact cooling water. And so we have two responses to that issue. The first is, of course, it's not up to agency's counsel now, nine months after the close of briefing on the eve of oral argument, to try to rehabilitate the agency's decision when the agency itself now has admitted that its original basis set forth in its decision documents was wrong as a matter of fact. And so this is a classic example of a post hoc rationalization where agency's counsel says something that the agency itself never at any point said in the record that Table 6 discusses or provides any information on the impacts of non-contact cooling water. So frankly, that's why we did not attach it to our further excerpts. The agency had never mentioned that at all at any point during its decision making process as providing a basis for its decision. So we frankly don't believe that that's relevant based on the appropriate standard of review. But getting to the substance of Table 6, Your Honors, what that information provides is a list of 300 dilution factors. 300 dilution factors that range in values from less than one to more than three million. The agency never explained which one of those 300 dilution factors would apply to these particular discharges. The agency never explains in the record how hot the non-contact cooling water is when it comes out of the drill ship. The agency never explains or applies that dilution factor and then never tells us what the impact on the temperature and the receiving water is. And so those dilution factors alone cannot provide any information for us sitting here today to understand and identify how the Can I... Tell me if I'm wrong in understanding the basis for the agency's original decision. I think I remember this from the briefing rather than from the underlying documents. But I thought their position was, look, based on our modeling, we've determined that whatever change in temperature is going to occur, that will be completely dissipated within, I don't know, if it's 100 meters, 500 meters of this exploratory well, right? And so they suggested, boy, that's not going to have any impact on the whales coming and going. So I assume from their submission of these tables to us in this letter that somehow all of these numbers supported that proposition. And I couldn't for the life of me figure out how that would be true. So I'm just interested, I'll ask them, but I'm interested in hearing what you have to say about that. Judge Watford, the first point I would make is that in the record, in the decision documents themselves, and so the most important decision document is the Ocean Discharge Criteria Evaluation, the ODCE, and that is the document the agency uses to set forth its determinations and conclusions on the impacts to alternate uses of the ocean. In the ODCE, EPA simply said deflection may occur as a result of the discharges. And so that's clearly set forth in the ODCE in determinations and conclusions. But then, in the response to comments, which was a separate document, EPA said, well, we looked at this through the modeling results and said it'll be 600 to 1 dilution at 100 meters from the drill ship. And that's what they also provided in their response brief. They provided that same explanation. So then in our reply brief, in preparation for our reply brief, we went back and looked at those modeling results and tried to go through the same exercise I think you referred to earlier of looking at those modeling results and trying to understand how the agency got to that conclusion. And then that's when we brought it to the Court's attention that, in fact, those results don't address non-contact cooling water at all. They address drilling-related cuttings and drilling fluids. And so now the agency in its notice yesterday didn't state either way how Table 6, the new information it provided, would reflect or inform its ultimate conclusion. It simply said, here's some more numbers. But there was no other articulation of what those numbers mean. And that's also not in the record. Of course, that's the standard of review. Did the agency provide that analysis on the record before its decision? And so I think this situation, I think, Your Honors, begs for a remand to the agency to clarify the record. And so the second point that I would really like to make about this issue is that I think it's important, if this panel in court does intend to remand for clarification of this issue, that it also provide some guidance to the agency on the applicable criteria to be applied under Section 403 and the findings that need to be made. And I ask that because if the agency, if the Court were to remand on these narrow grounds related to this modeling issue, I think it's likely we would be back here before the Court in a fairly short period of time discussing these same fundamental issues of law that apply. Under 403, it seems to me that EPA went through this in sort of cookbook fashion. I mean, they went down very, very specifically through the various criteria. So what instructions would you like us to give to EPA? Yes, Your Honor. So the first, there are three instructions that we would respectfully ask that the Court provide to the agency and they are consistent with the three points I raised earlier. I think the first and most fundamental instruction is that in Section 403 of the Clean Water Act, Congress articulated a criteria distinct from each other. So there is ecological risk as one criteria, there's human health risk as a second criteria, and then subsection C1c and C1g are standalone criteria that inform an analysis of effective disposal on aesthetic, recreation, and economic values. Right. But you're just asking us just to tell the agency to follow the statute. No, no. I'm not sure that you've given us anything that, that there's anything that we could impart to EPA that it doesn't already know. Yes. So, Judge Bybee, my response to that is that what EPA did here is that it conflated the analysis of alternate uses, impacts to alternate uses, with its analysis of human health risk and ecological risk. And so if you look in the Ocean Discharge Criteria Evaluation, again, in the excerpt of record at page 357, this is the key point in the record where this takes place. And what EPA did here is it discussed impacts to ecosystem diversity, productivity, and stability. So that's ecological risk. Threats to human health through direct physical exposure to the discharge pollutants or indirectly through consumption of exposed aquatic organisms. So that's human health risk. But there was no separate and distinct analysis of impacts to subsistence uses of the ocean. And so we would ask that the court instruct EPA to make detailed findings on impacts to alternate uses that are separate and distinct from EPA's discussion of human health risk and ecological risk. And it's that structure that Congress fundamentally set forth in Section 403 of the Clean Water Act and that was not present in this decision. EPA stopped at human health and ecological risk. The agency says that you don't measure what the agency did directly against the statute because the statute requires them to public regulations and the regulations are what need to be followed in this case. And is there anything... as I looked at the regulations, I thought that they seem to cover the things that you wanted covered from the statute. And what is it in the regulations that doesn't cover something in the statute? And is that an attack on the regulation, which may be untimely? Judge Cammey, as we discussed in a reply brief, this case most certainly is not an attack on the regulations. The first thing that I would ask the court to look at is the statement that EPA made in the preamble to the regulations. And this is at page 8 of the preamble attached to our opening brief. And there EPA stated explicitly at the time it issued the regulations that the statutory criteria form the basis for the determinations which must be made pursuant to these guidelines. So there the agency stated explicitly that statutory criteria apply. Furthermore, if you look at... What else could EPA have said, other than that they're bound by the statute? I mean, that's just a platitude, right? EPA said, well, we have a statute and we're going to follow it. I mean, that doesn't really tell us anything. It's not a Chevron interpretation. Your Honor... I know that you argued that, but there isn't anything... there's anything about Chevron there that... Your Honor, I think that the statement from EPA in the preamble has to be read in the context of the regulations themselves to understand why it's a meaningful statement for EPA in the preamble to say that the statutory criteria apply directly to decisions that are made under the permit. And that language is, frankly, I think, fundamentally inconsistent with the position that the agency has taken here, which is that the court should simply ignore the statute. I don't think the part you read said that they have to apply the statute directly to the action. I'm sorry, Judge Canby? I thought when you read the preamble, I didn't hear the language that you just characterized it as having, that you have to apply the statute directly to the action. Yes, Judge Canby, the other thing that I would ask the court to look at is the actual plain language of the regulation itself. And so the regulation is Section 125.122, and there, there is a list of nine criteria that were developed by the agency. The ninth criteria is such other factors relating to the effects of the discharge as may be appropriate. Okay, it's a catch-all. What didn't they do? Yes, Your Honor, so that's a catch-all. So I think that renders the statutory criteria relevant for the court's analysis and for the agency's analysis. And here, Your Honor, the agency never determined whether these discharges, 1.6 billion gallons of discharge, will cause these isolated communities to change their subsistence practices, to forgo collecting foods from these subsistence use areas. The agency never issued any detailed findings as to whether these discharges would deflect bowhead whale subsistence hunting grounds and subject my clients to great risk, having to travel long distances in the Arctic Ocean. So those findings were not made. Didn't it say that it was not likely to cause deflection, but that they would monitor it to see whether there was any defect in their reasoning? No, Your Honor, I don't believe that's right. And just let me grab, I'm just reaching for the excerpt because I want to be able to read a quote directly from the Ocean Discharge Criteria Evaluation for you, Your Honor. And it's at page ER 362 to 363. And this is what EPA has to say. This is the second full paragraph on page ER 363. EPA says that avoidance of drilling discharges and deflection from traditional migratory paths might result in adverse effects on subsistence communities. Might. If subsistence-related marine resources move farther away, there is the potential for increased risk to hunter safety, farther distances. And the deflection could reduce subsistence harvest. And then? And that's it. And then the agency says to address these concerns on an ongoing basis. The agency never said it's unlikely to occur. The agency simply said to address these concerns on an ongoing basis. And then in the next paragraph deals with deflection. That's right. But again, there's no, there's, there's no comment from EPA conclusion that deflection is unlikely to occur if you read that paragraph, Your Honor. And I think that also then begs the question, what modeling was EPA relying on? And that gets us right back to where we were earlier talking about the notice of error that the agency filed with the court yesterday. So how does, I mean, EPA seems to be caught in a little bit of a conundrum here because it apparently doesn't have any hard evidence that deflection will or will not occur. So it's given it sort of its best shot, but it doesn't think it's going to occur and then requires additional monitoring and reporting so they can find out whether in fact it does. So EPA seems to have sort of, sort of punted the question down there. It's, it says it seems to have concluded, we don't think it's going to, but that's why we're going to monitor this. And if something changes, then we'll re, we'll revisit this. So, Your Honor, I believe there is in fact hard information in the record that deflection will occur. And that is in the form of traditional knowledge from my clients. And that's based on, on drilling or it's based on something else? That's based on the effects of past drilling operations in these exact same areas of the Beaufort Sea from the 80s and 90s in which my clients observed. And were the conditions under which they were drilling the same as the conditions to which they'd be drilling today? We have, I mean, we have seasonal, we have to soften the impact on the, on the native communities. There are other, other restrictions here. Are those the same restrictions that were in place in the 80s and 90s? Or is there something different going on? Your Honor, in the 80s and 90s, I can't speak to what the precise mitigation measures were that were in place. We know that the drilling activities in the ships, ships were on site through the fall hunt. And that is the same activities that could possibly take place here, which is the drilling ships remaining on site in these same locations, the same locations, the same prospects through the fall hunt. And so we don't believe there's a material difference based on the terms and conditions of this permit. And that's the fundamental problem here, Your Honor, is that the discharge of all of this non-contact cooling water in the middle of the hunting activities is the same type of impact that would have resulted and did result from those earlier drilling operations. And so I see that I'm, I would like to reserve some time for rebuttal. I see I only have a couple minutes left. Thank you very much. Okay. Thank you, Mr. Winter. Good morning. My name is Dan Pinkson. I'm an attorney with the U.S. Department of Justice, and I'm representing respondent EPA in this case. One of the first things I'd like to bring to the Court's attention is the degree of the EPA's efforts to understand what the North Slope communities were concerned about in the granting of this permit. EPA undertook extensive efforts to try to figure out what the traditional knowledge is, what their concerns were. It involved quarterly presentations at the Alaska Eskimo Whaling Commission. They went to the North Slope. They contacted the North Slope Borough, other boroughs. They held meeting, community meetings. Among other things, they conducted 20 traditional knowledge workshops, which included 73 individual interviews. I guess I'm left wondering why the agency even bothered doing that, because it basically gave no weight whatsoever, it seems to me, to the information that was disclosed to it. Well, I have to disagree with that, Your Honor. As a matter of fact, there were a number of things that came out of a decision or out of the information that we received. There were changes in the permit, for example, in the proposed permit. For example, now there is a complete prohibition on the discharge of drilling fluids and cuttings during the fall bowhead hunting season. In the prior iteration of the permit that was proposed, there was a process by which the driller could come in and try to make a case that they should be able to discharge those fluids and so forth. So we did listen to what they had to say. I guess I'm thinking in particular, of course, of the no evidence statement that has been challenged here. So maybe you can address that, because even looking at the statement in context, it seemed to me you did have, or not you, but the agency did have evidence in the form of traditional knowledge, and yet the agency said, oh, we have no evidence that bowhead wells will be diverted at all. Well, first of all, I'm not sure that there's any scientific evidence, or as the petitioners have put it, Western science evidence. And there is some anecdotal reports that we reported in the traditional knowledge workshops, but there are a number of factors that led EPA to understand that there would not be an unreasonable degradation of the marine environment here. One of those is that when the discharge occurs, there's a small, well, depending on what you call small, but there's a plume that is carried along by the current, and then the, for example, the cooling water does, the temperature change dissipates over... What modeling did the agency do to support the statement in your brief? I can't remember what it was, but basically temperatures will be back to normal within some very small distance. Well, your honor, you see that we submitted a letter, and the reason we submitted a letter is because as we were preparing, we understood that while there was a reference to a case 33, it was mistakenly, we mistakenly said that that modeling result, which actually dealt with drilling fluids, was applicable to other non-drilling fluid discharges. So we felt that we needed to inform the court of that. There's also states in the record at various places that this case 33, the 600 to 1 dilution, showed that there would be no effect or little effect of the non-drilling fluid discharges. But when we went back and looked at the technical memorandum, and this is why we attached table 6, we looked at the technical memorandum that was done in preparation for issuing the general permit, we found that actually there had been modeling of produced water, or excuse me, of cooling water, which is among the non-drilling fluid discharges. And table 6 does show, in a number of cases, out of 100 cases, something like that, modeling cases, what would likely happen to the cooling water. You're going to, I mean, I look at this and it means absolutely nothing. I can explain it. So, I mean, yeah, you're going to walk us through this? No, no, it's only going to take a moment, and it's easy. The information we obtained from industry was that the average temperature difference between the ambient sea and the discharged cooling water is 1.5 degrees Celsius. Now, that can have, you know, that can vary according to the size of the outfall and the volume and so forth. But basically, that's the starting point. It's a 1.5 degree difference. So then, they took these various inputs, and if you look at table 6, effective water depth. Okay, how deep is the discharge? I mean, where is the outfall coming out? The current speed. Well, they looked at different cases. How fast is the water moving on its own? How much is being discharged? For example, if you look down at cases 108, or excuse me, 109 and 110, we looked at 45,000 barrels a day as a case. We looked at 113,000 barrels a day as a case. And if you move over, you see a dilution factor, and we did it at 10 meters from the discharge, 100 meters, and 1,000 meters. And the way you figure how this works is you take the dilution factor. Well, first of all, you take 1.5 degrees divided by this numerical dilution factor, and the end result tells you how much temperature increase is still there at 10 meters, at 100 meters, at 1,000 meters. And in almost every case, it turns out that we would be meeting, or the industry would be meeting, state water quality standards, which say that, and this EPA applied these state water quality standards not just to the drilling in the state waters, but also in federal waters, and they're actually more stringent than federal water quality criteria, but here's the thing. You can't increase the temperature in the ocean more than one degree Celsius on a weekly average basis, and you can't increase it more than half a degree in an hour. If you go through this, it shows that the water quality standards are being met in almost every case. And I should also say that this modeling is actually conservative because it doesn't include, and we talked about this in the technical memorandum that's before the court now, it's conservative because it doesn't include the effect, the jetting effect, which is if you're shooting the water out faster, it dissipates faster. So we took a very conservative approach here, and what this shows is that, in fact, in every case at a hundred meters, it may not be 600 to 1, it may be higher than 600 to 1, but the bottom line is that with this cooling water, you have a dissipation of the temperature very quickly. Now, it wasn't simply just the modeling, the 600 to 1 that we relied on, and saying, well, there's no unreasonable degradation, and that we don't think that deflection of bowhead whales migration would be a problem. There are other factors here too. One is that the general permit only allows five drilling sites per lease area, which is three miles by three miles. The EPA is only expecting somewhere, I can't remember the precise figure, but it's like 18 to 34 exploration wells in the whole Beaufort Sea. And as a matter of fact, as to now, there haven't been any. There's not expected to be any in 2015. Shell Council can, who's here, and I've yielded five minutes to them, can explain. I don't know that we can judge the permit on that, though, can we? No, no, it has to stand or fall on whether or not we met the regulatory criteria, the guidelines, and we went through those guidelines in great detail. And just as an aside, I think it's straight, plain, statutory interpretation what 403 does. 403 says, EPA, you go regulate this, and here's some things you need to think about when you regulate it. But the actual, what the agency has to comply with are the regulatory guidelines, not the specific statutory factors that are listed in 403. EPA did its job. It looked at the statutory factors in coming up with the guidelines. Let me ask you this. Did the agency ever actually quantify the benefit of the discharges subject to the restrictions that the petitioner wants here? What the agency did was, in going through all of the factors, it looked at the, it looked at the likely effects of the discharge, or at least the possible effects. Okay, I'm not talking about the negative effects on that side. I'm talking about the benefits, right? Because just under 120, let's see, is it 120.121E3, you have to do the balancing, right? And you've got to determine that, let me make sure I get the language right here, the loss of aesthetic, recreational, scientific, or economic values which is unreasonable in relation to the benefit derived from the discharge. And I guess I never saw anything in any of these documents where the agency actually calculated, what's the benefit of the discharge subject to the conditions? Because what if it was minuscule? What if the cost to Shell was $100 per well of imposing all of the restrictions that the petitioners asked for? Then it would seem to me that when you're doing the balancing, boy, if there was even a little bit of harm on the other side, you'd just have to say that it was unreasonable in relation to the benefit derived. Well, let me come around to that a little bit differently. And that is the three factors in the definition of unreasonable discharge are incorporated into the guidelines. So I understand there is that provision and I don't, I'm not aware of any place in the record where EPA said, well, there may be five billion barrels of oil here and it's going to cost Shell this amount of money to look at it, or look for it, and we're going to balance that against, there could conceivably be deflection of bowhead whale migration. No, we didn't do that. I don't think we needed to do it. Well, but it's not even that, I'm not even talking about there might be five billion barrels of oil under there. The petitioners aren't actually trying to stop the extraction of that oil altogether, right? They're just saying, when you drill these exploratory wells, can you please impose these additional conditions? And it seemed to me it was incumbent upon the agency to figure out, okay, well, what would the cost be to the operators? No? No, but your honor, it's not incumbent on the agency to make the economic decision whether or not it makes sense for Shell to go out and look for oil up there. The Clean Water Act is set up in such a way that if you meet the conditions, then you can obtain a permit which will involve discharges as here. And there is a... The effort that EPA made here, the extraordinary effort really, was to try and find out what are in the ocean discharge criteria evaluation, other documents, was to try to figure out what could go wrong here, what could be the problem. And EPA did that at great length. And the record includes biological evaluation of how it'll affect, threaten their endangered species. It involves the technical memorandum, all the modeling. It involves the ocean discharge criteria evaluation. It involves an equal environmental justice report, which we went to at great length. But counsel, just... I'm sorry to put you back on this, because I still just want to... I don't have a feel for what your answer is. It says that your regulation, the agency's regulation, says you have to balance the loss against the benefit derived. And I'm just saying, how can you do a balancing if you don't know what's on one side of the equation? And you're basically admitting, no, we never tried to figure out what the actual benefit side was. So how can you measure that? How can you balance that against the loss and come up with any rational... Well, to some extent, though, the benefit here would be, and I'm not... If it's not in the record, obviously, that can't be the basis for the agency decision in some sense. But we're all aware of the importance of oil and gas exploration and ultimate production. And the ocean discharge criteria are an attempt to, in a sense, allow these kinds of activities to go forward while maintaining the environmental protections that are required. I don't think that... I think it's too narrow a reading to say that if there isn't some economic evaluation of whether or not it makes sense for Shell to do this. That's not even what I'm talking about. I guess you keep coming back to that. And I'm not saying that's the agency's job. That's Shell's job, right? They're the ones who have to invest the capital. I'm saying that your job, your agency's job, is to balance the loss, the potential loss, against the benefit. And it seems to me the benefit has to be measured by, okay, they're still going to be able to do this, right? Nobody's talking about shutting down oil exploration altogether. It's just there's going to be some added cost, presumably, right? Which is why I assume Shell is here to resisting this. And don't you have to at least figure out what that cost is to then measure it against the loss? I don't think so, Your Honor. I think that if we go through... And I understand what you're saying. I think if you go through these guidelines, and what EPA really did here was to figure out what could be the problems. What is reasonable or unreasonable degradation of the ocean environment? And it's important to remember, and this doesn't directly respond to your question, but it's important to remember that the standard is not no degradation. The standard is unreasonable degradation. And EPA proceeded under the portion of the regulations that says, we have enough to know that there won't be unreasonable degradation here. We don't need the monitoring to do that. It makes sense to do it. It could possibly, during the course of, you know, if there is ever any drilling up there, it could inform the agency in such a way, oh, well, there's a problem. This model is not working, whatever. I mean, that could have an effect. But we knew enough through all the work that was done to realize that it was not an unreasonable degradation. And it's not just because of the toxicity of the discharges. It's because we're talking about discharges in a small area. And the animals that they're particularly concerned with, bowhead whales, are a migratory species. They pass through. They may or may not ever encounter one of these drilling rigs. We don't know really, I mean, there's any deflection as a result of cooling water from a drill rig 10 miles away. That's not known. Do you have to figure that out before you can issue this permit? No, I don't think you have to figure that out because the standard is reasonableness. There is nothing in the Clean Water Act that says, if a whale migration might be deflected, you can't go forward with the permit. And bear in mind, too, the EPA did an elaborate biological evaluation of the effect on endangered species, including bowhead whales, which was then concurred in by the NMFS, the National Marine Fisheries Service, and by, with regard to different endangered species, by the Fish and Wildlife Service. Took another look at it. Your Honor, I'm down to three and a half minutes. I will yield my time over to Shel if there are any other questions. I'll be happy to answer them. Thank you. Thank you. Good morning. My name is Kyle Parker. I'm here today on behalf of Shel. I think I just want to touch on one thing, and specifically in regard to why we're here. We're not here because we are unhappy about the general permit itself. We think the general permit, as it's been developed and implemented by the agency, is perfectly appropriate for regulating discharges in the broad Beaufort Sea. It's an area of several hundred thousand square miles. Our position here is that the restrictions, the additional restrictions that the petitioners here would like to impose on the agency through the permit are not appropriate. The permit is specifically designed to provide the agency with flexibility to address issues at specific locations that a company might step forward and propose operations at. And I think what the agency's done here, with the adoption of this general permit, is appropriate. They've adopted, they've done the proper analysis to determine there's no unreasonable degradation, which gets them out of the step of having to do the balancing and the additional alternatives analysis. No, it doesn't, because the portion of the regulation I just quoted from is the definition of what unreasonable degradation is. So unless you've done the balancing, at least as to that third factor, you can't make the conclusion that there's no unreasonable degradation. Let me address one issue that came up earlier in the argument today, Your Honor, and that was this question about record evidence. In fact, we've got 35 years of activities, industry activities in the Beaufort Sea. Those 35 years of activity have informed the agency and the development of this general permit. We have multiple general permits that have been in place prior to this that have been litigated prior to this. And what you have before you now is largely informed by all that prior work, the prior litigation, and the permit's been greatly refined to reflect kind of the current best practices for operations in the Arctic. And as for the evidence, record evidence, as to what's out there and what impacts are out there, there is tremendous amount of evidence about the industry activities, discharges associated with those activities, and the fact that there is no significant, no impact to the species that are in the area. That is not what the traditional knowledge reflects at all. The traditional knowledge is out there as well, Your Honor, but there's also the evidence of all the other activities that are out there that has got to be taken into account as well in the context of developing the permit. Why shouldn't we, I mean, I guess it seems a little bit odd to me that your client has been willing, at least for one season, to agree to the additional restriction. So it seems like, shouldn't we infer from that that it is feasible for your client to continue these activities subject to these restrictions? And to my point, and just as I started my presentation, Your Honor, the general permit provides the agency with broad flexibility to address specific programs that are proposed at specific locations across Beaufort Sea. In this instance, in Shell's program that was proposed for these activities in the Camden Bay, which is in the middle of where there is a significant amount of subsistence activity, we made the decision, Shell made the decision, to work with the AEWC and come up with an approach that would correctly address the issues and circumstances presented by our planned activities. That could be completely different if we propose activities somewhere else in the Beaufort Sea where there is no subsistence activities, where there is no evidence of whale migrations. And so what is appropriate for the location that had been proposed in Camden Bay might be something completely different for a location proposed several hundred miles away in Harrison Bay or Smith Bay, where the activities are different, the physical environment is different. And so the agency, we think that the general permit approach here, and what the agency has done with the adoption of this general permit, is allows for the flexibility to address the specific issues that the agencies, the companies, and the local communities are going to have to deal with. Okay, but this is just a cost issue, right? At the end of the day, you don't want to have to, I mean, you voluntarily agreed in this one instance to comply with these additional restrictions. You don't want those imposed upon you as a matter of law by the EPA because it's going to cost more, I assume, to engage in the exploratory activities? Well, it's not necessarily just a cost issue. There are also risks associated with maintaining these materials that are collected and held on these rigs. And there's also a practicality issue. When we're looking at things like non-contact cooling water, that's relatively a large volume of discharges, and that's not something that's easily maintained and held on a drilling platform. They're not asking you to do that, as I understand it. They want no discharges of certain pollutants, if we want to call them that. But I don't think they were saying you have to capture all the non-contact cooling water. Again, the permit provides for a real examination of the specific program, what all the discharges associated with that program will be, and a tailoring of the discharges or what you were not going to be allowed to discharge based on the specific factors as presented. How about just not doing this stuff during the fall hunt season? That to me seems to have nothing to do with any additional risk or whether it's feasible to engage in the activity. If you could agree to that condition in one location, why wouldn't you be able to agree to it in all of them? Well again, the general permit covers a broad area, several hundred thousand square miles. And in the Arctic, our operating season is very limited based on weather conditions and ice conditions. And so the fact is that the open water season, the time within which we can operate, happens to overlap with the fall subsistence whale hunt. And again, the subsistence whale hunt, it's a well-known corridor of where the activities are happening along the North Slope of Alaska and the Beaufort Sea. And the companies work with the ADWC, and we've worked I think cooperatively with them to come up with appropriate modifications to our programs to address the specific issues that are encountered at these various locations. But that again is the beauty of the general permit. The general permit again covers such a broad area that you can't come in and say, okay, one size fits all for every operation across this broad area. This is what you're going to have to do. With many of these different discharges, you can modify what you're going to be allowed to discharge, what you're going to have to hold on the vessel, based on the specific facts that you encounter and where you proposed your operations. Thank you. Thank you, Mr. Parker. Mr. Winter, you have some time reserved. Thank you, honors. I'd just like to make a couple of quick points. First, Mr. Parker referenced the previous wells that have been drilled in the Arctic and suggested there was some body of evidence or data that the agency could rely upon. In fact, there have been 31 exploratory wells drilled in the Beaufort Sea. This is in the excerpt of record, page 333. Also the record reflects that EPA lost the data that resulted from those drilling operations. So that also is reflected at ER 333, also at ER 555, and ER 745. And so the agency did not retain the data from those previous drilling operations. Your honors, with respect to Judge Watford's question as to the seasonal restriction and whether that could be incorporated into the general permit, absolutely a seasonal restriction could be incorporated into the general permit. EPA knows because my clients have told them precisely where these subsistence hunting activities take place, when they take place, by what villages. And so although the general permit applies to a very large area in the Beaufort Sea, it would have been easy for EPA to design a seasonal restriction that had geographic limitations based on the input from our clients as to precisely where those subsistence activities take place. And there is no provision later in the permitting process when a notice of intent is filed for EPA to come back in and impose those kinds of restrictions. And so this is the only time the agency has the chance to do that. And finally, your honors, with the few seconds I have remaining, Mr. Pinkston attempted to provide an explanation of how to interpret these 300 dilution factors, suggested that there was some starting point of difference in ambient temperature between the discharge and the receiving waters of 1.5 degrees Celsius, and that the court should take it upon itself to then run those calculations to try to understand where the agency was going. Mr. Pinkston did not provide any of us any citations in the record for any of that information. Frankly, apart from this discussion, there's nowhere we can go in the record to understand where the 1.5 degree figure comes from, how those calculations are to be run, or what the outputs and results would be. And so again, I'd just like to emphasize that that is a post hoc rationalization. I think the agency needs to do that work on remand. Thank you very much. Mr. Winner, we thank all counsel for the argument of the Alaska Eskimo Whaling Commission versus EPA that were submitted, that we've completed the oral argument calendar for the day. The court stands in recess.
judges: Canby, Bybee, Watford